CHRISTINA VON DER AHE RAYBURN (SBN 255467)
cvonderahe@orrick.com
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
2050 Main Street, Suite 1100
Irvine, CA 92614-8255
Telephone: 949.567.6700
Facsimile: 949.567.6710

BRENNA K. LEGAARD (*Pro Hac Vice Pending*)
blegaard@schwabe.com
ANGELA E. ADDAE (*Pro Hac Vice Pending*)
aaddae@schwabe.com
**SCHWABE, WILLIAMSON & WYATT, P.C.**
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone: 503.222.9981
Facsimile: 503.796.2900

Attorneys for Defendant Ni-Q, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| PROLACTA BIOSCIENCE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NI-Q, LLC, an Oregon limited liability company, and DOES 1-10, inclusive,<br><br>Defendant. | Case No.: 2:17-cv-04071-SJO-E<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S NOTICE OF RULE 11 MOTION FOR SANCTIONS**<br><br>Honorable S. James Otero<br>Ctrm: 10C<br>Date:  August 28, 2017<br>Time: 10:00 a.m.<br><br>Date Action Filed:  May 31, 2017<br>Trial Date: N/A |

# Table of Contents

I.      INTRODUCTION ...................................................................................1

II.     BACKGROUND ....................................................................................1

        A.      Breast Milk for Preterm Infants ..............................................1

        B.      The '921 Patent .......................................................................2

        C.      This Dispute .............................................................................3

III.    LEGAL STANDARD .............................................................................6

IV.     ARGUMENT ..........................................................................................7

V.      CONCLUSION .....................................................................................10

MEMORANDUM IN SUPPORT OF                                    2:17-CV-04071-FFM
RULE 11 MOTION FOR SANCTIONS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Antonious v. Spalding & Evenflo Co.*,
5
   275 F.3d 1066 (Fed. Cir. 2002) ...................................................................7

6
*Bender v. Infineon Technologies North Am. Corp.*,
7
   2010 U.S. Dist. LEXIS 24096 (N.D. Cal. Mar. 16, 2010) ...........................7

8
*Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*,
9
   498 U.S. 533 ..................................................................................................6

10
*Judin v. United States*,
11
   110 F.3d 780 (Fed. Cir. 1997) ......................................................................6

12
*Kendrick v. Zanides*,
13
   609 F. Supp. 1162 (N.D. Cal. 1985).............................................................6

14
*King v. Idaho Funeral Service Ass'n*,
   862 F.2d 744 (9th Cir. 1988) ........................................................................9
15
*Lauser v. City College of San Francisco*,
16
   359 Fed. App'x 755 (9th Cir. 2009) ..............................................................9

17
*Network Caching Tech I*,
18
   2002 U.S. Dist. LEXIS 26098 (N.D. Cal. Aug. 13, 2002) ...........................7

19
*In re Omnitrition Int'l Secs. Litig.*,
20
   1994 U.S. Dist. LEXIS 21600 (N.D. Cal. Aug. 19, 1994)............................6

21
*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
22
   581 US ___, 197 L.Ed. 2d 816 (2017) .......................................................10

23
*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
24
   208 F.3d 981 (Fed. Cir. 2000) ..................................................................7, 8

25
**Other Authorities**

26
Fed. R. Civ. P. 12(b)(6) .....................................................................................10

27
Fed. R. Civ. P. 11 ........................................................................................*passim*

28

ii

Fed. R. Civ. P. 11(b)(1) ..................................................................... 6

Fed. R. Civ. P. 11(b)(3) ..................................................................... 6

Fed. R. Civ. P. 11(c)(2) ..................................................................... 10

MEMORANDUM IN SUPPORT OF
RULE 11 MOTION FOR SANCTIONS

2:17-CV-04071-FFM

# MEMORANDUM IN SUPPORT

## I.   INTRODUCTION

Plaintiff Prolacta Bioscience, Inc. ("Prolacta") sued Ni-Q, LLC ("Ni-Q") for infringing US Patent No. 8,628,921 ("the '921 patent") after admitting in writing that it cannot tell whether Ni-Q's product infringes the '921 patent or not.  Ni-Q has explained on multiple occasions that it does not infringe the '921 patent or any patent owned by Prolacta.  Prolacta's Complaint fails to comply with Rule 11, and sanctions are appropriate.

## II.   BACKGROUND

### A.   Breast Milk for Preterm Infants

A diet of human milk can be critical to the survival of very small preterm infants who weigh less than 1250 grams.  Many premature and low-birth-weight infants' digestive systems are not fully formed.  These very fragile babies have a difficult time processing the proteins in cow's milk-based formula, and as a result, they often develop an intestinal infection called necrotizing entercolitis.  This dangerous and severe complication causes the intestines to disintegrate, and requires surgical intervention to remove dead portions of intestines in 20% to 40% of cases.  The fatality rate of this surgery is as high as 50%.  Feeding these tiny babies exclusively human milk has been shown to reduce the incidence of necrotizing entercolitis.  For this and other reasons, the American Academy of Pediatrics has said that all preterm infants should receive human milk, if not from their mothers, from milk donors.

Plaintiff Prolacta receives human milk from donors and processes it to make fortifier and other products that are sold to hospitals and clinics and used to feed preterm and other medically fragile infants.  Ni-Q is a nascent company, and a new entrant to the market for human milk-based nutrition for very small preterm infants.  Ni-Q currently uses donated human milk to make a safe, nutritionally enhanced food for preterm infants made entirely of human milk.

Prolacta pays nursing mothers $1 per ounce for donated milk. It then sells fortifier made with that milk to hospitals and clinics for $180 per ounce. Feeding a single preterm infant using Prolacta's fortifier for several weeks may cost more than $10,000. Some hospitals, especially those serving poor populations, need to feed the tiny preterm infants in their care human milk-based food, but do not because they cannot afford to purchase Prolacta's product.

Ni-Q sells its product for $12.50 per ounce. Because Ni-Q's product is different than Prolacta's fortifier product, and because there simply is not enough donated human milk to meet the existing demand, Ni-Q's entrance into this market is highly unlikely to cost Prolacta any market share. However, Ni-Q's significantly lower price for its product may threaten Prolacta's ability to continue to charge $180 per ounce for its fortifier product.

### B.   The '921 Patent

The '921 patent is entitled "Methods for Testing Milk." It covers genetic testing of donated milk in order to match it to its donor, but all claims of the '921 patent also require that the milk in question have a specified composition in order for there to be infringement. Claim 1 of the '921 patent is exemplary, and is reproduced below with the composition requirement emphasized:

1.   A method for determining whether a donated mammary fluid was obtained from a specific subject, the method comprising:

(a)   testing a donated biological sample from the specific subject to obtain at least one reference identity marker profile for at least one marker;

(b)   testing a sample of the donated mammary fluid to obtain at least one identity marker profile for the at least one marker in step (a);

(c)   comparing the identity marker profiles,

wherein a match between the identity marker profiles indicates that the mammary fluid was obtained from the specific subject; and

2

(d)    processing the donated mammary fluid whose identity marker profile has been matched with a reference identity marker profile, ***wherein the processed donated mammary fluid comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55 mg/mL; and a human carbohydrate constituent of 70-120 mg/mL***.

Prolacta tried repeatedly to obtain patent claims that covered genetic matching of milk to donor without the composition requirements, but the US Patent and Trademark Office determined that such claims were not patentable, and so the claims were amended to add the composition requirements.  (Declaration of Brenna Legaard in Support of Rule 11 Motion for Sanctions ("Legaard Decl.") Ex. K).   As a result, the '921 patent only covers genetic matching of donor and milk where the milk contains protein, fat, and carbohydrate constituents in the ranges called out by the claim.  Prolacta's competitors have every right to genetically match milk and donor if their products do not contain the protein, fat, ***and*** carbohydrate constituents in the claimed ranges.  Prolacta's competitors are also free to sell milk that has protein, carbohydrate, and fat contents that fall within the range in Prolacta's claims so long as they do not also genetically match that milk with its donor.

## C.    This Dispute

In November 2016, Cooley LLP, acting as Prolacta's counsel, contacted Ni-Q to notify it of Prolacta's patents.  "While we currently have very limited visibility into the products and processes being developed by Ni-Q," the letter stated, "it has come to our attention that you may be relying on matching donor genetic identity marker profiles with donated milk samples." (Legaard Decl. Ex. A).  The letter asked Ni-Q to ensure that its products did not infringe any of Prolacta's patents, and offered to discuss a potential business relationship.  *Id.*  In response to that letter, Ni-Q conducted an investigation and concluded that it did not infringe any claim of any patent assigned to Prolacta.

On March 21, 2017, Ni-Q's Chief Executive Officer Bill Pfost informed

MEMORANDUM IN SUPPORT OF
RULE 11 MOTION FOR SANCTIONS

2:17-CV-04071-FFM

Prolacta's Chief Executive Officer Scott Estler via email that "I remain extremely confident that we are not infringing any of Prolacta's patents." (Legaard Decl. Ex. B). In a March 22, 2017 response, Mr. Estler replied that "[t]he fact remains that based on your brochure, we are concerned that you are infringing our patent." (Legaard Decl. Ex. C). The brochure in question refers to genetic matching, but contains no information about the composition of Ni-Q's milk or any other information about its processes. Mr. Pfost explained that to Mr. Estler on April 3, 2017:

> I do not understand the basis of your concern about Ni-Q infringing Prolacta's patents. We are unaware of any legitimate basis for such a concern, and nothing in Ni-Q's brochure should have raised such a concern. Certainly, the claims of Prolacta's patents require more than just 'matching donor genetic identity marker profiles with donated milk samples…' Unless you can provide a detailed explanation of why you think we infringe, I consider this matter closed.

Legaard Decl. Ex D.

Prolacta then sent a letter through different counsel, Jaye G. Heybl, admitting that Prolacta "has been unable to uncover details regarding Ni-Q's products sufficient to show whether or not Ni-Q's products are infringing Prolacta's patents." (Legaard Decl. Ex. E). Further, Mr. Heybl admitted that "Ni-Q has provided no information in its communications with Prolacta, Ni-Q's products are not readily available, and there is little publicly available documentation on Ni-Q's products and methods." *Id*. But even though he had just explicitly admitted that Prolacta was unable to determine if Ni-Q was infringing its patents or not, Prolacta continued to press its claims. *Id*. Prolacta demanded that Ni-Q disclose confidential and proprietary information, including details of Ni-Q's filtering and treatment processes, to prove that its products do not infringe Prolacta's patents. *Id*. Ni-Q refused to provide such information to "those outside the company, particularly its competitors," continued to explain that it did not infringe any patent owned by Prolacta, and reiterated a request for a claim chart explaining which patent or patents Ni-Q supposedly infringed and how. (Legaard Decl. Ex F).

4

On May 19, Prolacta's counsel sent another letter demanding that Ni-Q disclose confidential information to Prolacta, while still refusing to even specify which patent Ni-Q was supposedly infringing. (Legaard Decl. Ex. G).

On May 31, 2017, Prolacta filed its Complaint (Dkt. 1) alleging infringement of U.S. Patent No. 8,628,921 ("the '921 Patent"). The following day, Ni-Q informed Prolacta that:

> "[t]he Complaint contains inaccuracies, most specifically with regard to the allegations set forth in Sections 16, 17 and 22 of the Complaint. Ni-Q does not engage in 'testing mammary fluid (including milk) to establish or confirm the identity of the donor of the mammary fluid.' Further, Ni-Q does not engage in 'testing human milk-based products utilizing the same methods as those in the '921 Patent.' Additionally, it appears that there is no evidentiary basis, no Rule 11 support, for the allegation in the Complaint that 'the donated mammary fluid for the Ni-Q products in question are then processed so that the donated mammary fluid comprises the protein, fat and carbohydrate constituents in the ranges provided in claim,' at least because Ni-Q does not practice this process.

(Legaard Decl. Ex. H).

In response, Prolacta insisted that "facts discovered through investigations support Prolacta's belief that Ni-Q is infringing at least one of Prolacta's patents...." (Legaard Decl. Ex I). However, those "facts discovered through investigations" are absent from Prolacta's Complaint, and Prolacta has never addressed Ni-Q's repeated explanations that there is no infringement. Prolacta's Complaint is a pro forma recitation of the elements of the claims of the '921 patent, and contains no factual support for its allegations.

On June 16, 2017, Mr. Heybl sent another email which purportedly discloses the factual support for Prolacta's lawsuit, but it cites exclusively to references to genetic matching of donor and milk in outdated Ni-Q marketing materials that do not disclose the composition of Ni-Q's products. (Legaard Decl. Ex. J). The email completely ignores the composition requirements in every claim of the '921 patent. Thus, to this day Prolacta has never articulated a factual basis for its allegation that the composition requirements in the '921 patent are met by Ni-Q's product.

### III.   **LEGAL STANDARD**

Rule 11 requires that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Rule 11(b)(3). The Rule also requires that a paper "not be[] presented for any improper purpose, such as to harass." Rule 11(b)(1).

Rule 11 makes every signature on a pleading, motion or other paper a certification of merits of the documents signed and authorizes sanctions for violation of the certification.  Fed. R. Civ. P. 11. Any signing party has an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 551-54 (1991) (affirming application of objective standard to Rule 11 and upholding sanctions against party for filing complaint of copyright infringement with no factual basis); *see also In re Omnitrition Int'l Secs. Litig.,* 1994 U.S. Dist. LEXIS 21600, *11-12 (N.D. Cal. Aug. 19, 1994) ("It is settled in this Circuit that both attorneys and litigants are held to an objective standard of reasonableness under Rule 11.").  In order to conduct a reasonable inquiry, counsel must obtain "sufficient credible information . . . to enable them to form a reasonable belief that the allegations to which they put their signature are well-grounded in fact." *Kendrick v. Zanides*, 609 F. Supp. 1162, 1172 (N.D. Cal. 1985).

In the patent litigation context, it is well established that a patentee may only file suit after establishing via a reasonable prefiling investigation that the accused product includes each and every limitation of the asserted claims.  *See, e.g., Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (finding a Rule 11 violation where neither patentee nor his attorney compared the accused devices with the patent claims or otherwise made a reasonable inquiry to determine that the complaint was well grounded in law and fact).  "In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to the court, exactly why it believed

before filing the claim that it had a reasonable chance of proving infringement.
Failure to do so . . . should ordinarily result in . . . sanctions." *View Eng'g, Inc. v.
Robotic Vision Sys., Inc.,* 208 F.3d 981, 986 (Fed. Cir. 2000) (imposing Rule 11
sanctions where patent holder performed no independent claim construction or written
infringement analysis).

Rule 11 requires a plaintiff claiming infringement to "compare an accused
product to its patent on a claim by claim, element by element basis for at least one of
each of the defendant's offending products." *Network Caching Tech I*, 2002 U.S.
Dist. LEXIS 26098, at *16 (N.D. Cal. Aug. 13, 2002); *see also Antonious v. Spalding
& Evenflo Co*., 275 F.3d 1066, 1074 (Fed. Cir. 2002) (setting forth diligence
requirement for pre-filing investigation of patent cases); *Bender v. Infineon
Technologies North Am. Corp*., 2010 U.S. Dist. LEXIS 24096, at *1, (N.D. Cal. Mar.
16, 2010) ("plaintiff is required to include [in its] infringement contentions all facts
known to it, including those discovered in its Fed. R. Civ. P. 11 pre-filing
investigation.").

## IV.   **ARGUMENT**

Before suing Ni-Q, Prolacta and its counsel were required to conduct a
reasonable inquiry and determine that the allegations in the complaint were well-
grounded in fact. *View Eng'g,* 208 F.3d at 984.  This includes **both** the allegation that
Ni-Q tests milk to genetically match it to its donor, **and** the allegation that Ni-Q's
products contain fat, carbohydrate, and protein components which fall within the
ranges called out in the patent claims. (*See* Compl., ¶22).  When challenged to point to
factual support for its allegations, Prolacta pointed to outdated marketing materials
that made reference to testing milk to match it to its donor,  but Prolacta has never
pointed to any evidentiary support for its allegation that Ni-Q's products meet the
composition requirements of the '921 patent. (Legaard Decl. Ex. J).  Prolacta either
conducted no investigation into whether Ni-Q's products met those requirements, or it
obtained Ni-Q's product, discovered that those requirements are not met, and sued

anyway.  Either way, its conduct should be sanctioned.

In *View Engineering,* the Federal Circuit affirmed sanctions imposed on a law firm that filed a complaint for patent infringement without first establishing a factual basis for its allegations.  In that case, like this one, the patentee readily conceded that it did not have a basis to believe that all limitations of the asserted claims read upon the accused product, but filed suit anyway.  208 F.3d at 984-85.  The patentee argued that its actions were justified because the accused infringer "refused to permit examination of its machine or drawings... so there was no way for [the patentee] to determine if [the accused infringer] was actually infringing the eight patents until [the patentee] had an opportunity complete at least preliminary discovery."  *Id.*  The Federal Circuit sanctioned the law firm that filed the complaint, noting that the accused infringer had no obligation to provide the patentee with pre-litigation discovery.  Sanctions were appropriate because "[a] patent suit can be an expensive proposition.  Defending against baseless claims of infringement subjects the alleged infringer to undue costs-- precisely the scenario Rule 11 contemplates.  Performing a pre-filing assessment of the basis of each infringement claim is, therefore, extremely important."  *Id.* at 985.

Ni-Q's products are being sold to hospitals and clinics, and the product composition is listed on its label.  Prolacta either sued Ni-Q without performing any investigation whatsoever, or, worse, it performed that investigation, learned that Ni-Q's products do not infringe, and sued anyway.  Prolacta is a well-established and well-capitalized company with established revenue.  Ni-Q has just brought its product to market, and is entirely dependent on investment capital in order to continue to operate.  Ni-Q is actively seeking additional investment, and Prolacta's specious lawsuit has apparently alarmed potential investors and has delayed Ni-Q's funding.  Moreover, Prolacta's complaint demands an order requiring Ni-Q to turn over its product and the breast milk in its possession to Prolacta for destruction. (Compl. at p. 8, item E).  Ni-Q is concerned that this demand will discourage nursing mothers from

8

donating milk.   Under these circumstances, even a baseless suit that is quickly

dismissed can injure a company in Ni-Q's position and advantage a competitor such

as Prolacta.

Prolacta's failure to establish through basic due diligence that all limitations of

its claims are met by Ni-Q's products creates proper grounds for the imposition of

sanctions under Rule 11.  Prolacta and its counsel failed to conduct a reasonable pre-

filing inquiry that established a factual basis for its allegations, and failed to heed

numerous warnings that Ni-Q's products do not infringe any of Prolacta's patents.

*See Lauser v. City College of San Francisco*, 359 Fed. App'x 755, 756 (9th Cir. 2009)

("the district court properly imposed Rule 11 sanctions . . . because [the subject of the

sanctions] submitted a complaint that was not warranted by existing law and failed to

conduct a reasonable inquiry after he was informed by opposing counsel that the

complaint was baseless.").  Rule 11 is designed to promote judicial economy and deter

plaintiffs from prematurely filing groundless claims.  Prolacta's failure to conduct a

reasonable inquiry into the viability of a pleading constitutes a waste of the parties'

time and resources, and such behavior should be sanctioned.  *See King v. Idaho*

*Funeral Service Ass'n*, 862 F.2d 744, 747-48 (9th Cir. 1988) (district court properly

imposed sanctions against attorney who produced no evidence of a pre-filing inquiry).

Further, Prolacta sued Ni-Q in the Central District of California after the US

Supreme Court ruled in *TC Heartland LLC v. Kraft Foods Grp. Brands LLC,* 581 US

___, 197 L.Ed. 2d 816 (2017)  that an entity such as Ni-Q can only be sued for patent

infringement in the state of its incorporation or where it has committed acts of

infringement and maintains a regular and established place of business.  Oregon is Ni-

Q's state of incorporation and the only state in which it maintains a place of business.

Prolacta's Complaint contains a pro forma allegation that "upon information and

belief, Ni-Q has at least one regular and established place of business within this

judicial district." (Compl., ¶8).  But the Complaint fails to identify this purported

place of business.  A regular and established place of business maintained by a

commercial entity should not be a difficult thing to identify, and Prolacta was
obligated to identify this place of business through a reasonable investigation in order
to ensure that its venue pleading was well-supported.  Instead, Prolacta cites to the
personal LinkedIn profile of Ni-Q's Chief Executive Officer, who lives in San
Clemente, California.  Prolacta does not provide any factual support for its allegation
that Ni-Q is conducting business out of Mr. Pfost's personal residence.  Nor does
Prolacta have a factual basis for its allegation that Ni-Q has committed acts of
infringement in California, as Ni-Q has not sold any product in California.

## V.    **CONCLUSION**

Plaintiffs have failed to conduct a reasonable and competent inquiry of Ni-Q's
products before filing this lawsuit, and have asserted baseless claims.  This lawsuit is
frivolous, and the Plaintiff should be sanctioned pursuant to Rule 11(c)(2).
Specifically, Prolacta should be ordered to pay Ni-Q's costs in responding to
Plaintiff's claims, including the cost of this motion and its motion to dismiss
Prolacta's complaint under Fed. R. Civ. P. 12(b)(6).  At this time, Ni-Q cannot
determine the total cost that will be incurred as a result of this motion and its pending
motion to dismiss. Should the Court find the requested award is appropriate, Ni-Q will
submit a fee petition to the Court identifying and including such costs.


Dated:        July 12, 2017              CHRISTINA VON DER AHE RAYBURN
                                         Orrick, Herrington & Sutcliffe LLP


                                         By:  */s/ Christina Von der Ahe Rayburn*
                                              CHRISTINA VON DER AHE RAYBURN
                                              Attorneys for Defendant