# Exhibits A-K



Michelle S. Rhyu, Ph.D.                                                                                    Via FedEx
+1 650 843 5505
rhyums@cooley.com

November 11, 2016

Bill Pfost
CEO
Ni-Q
28050 SW Boberg Road
Wilsonville, Oregon 97070

RE:      **Prolacta Bioscience**

Dear Mr. Pfost:

I am an attorney representing Prolacta Biosciences ("Prolacta").  I write to apprise you of U.S. Patents
owned by Prolacta.  While we currently have very limited visibility into the products and processes being
developed by Ni-Q, it has come to our attention that you may be relying on matching donor genetic
identity marker profiles with donated milk samples. Accordingly, we encourage you to review certain of
our patents, listed below, to ensure that your products and processes under development do not fall
within the scope our patent rights.  A full list of our patents can be found on our website at
http://www.prolacta.com/our-intellectual-property.

            US 8,278,046
            US 8,628,921
            US 7,943,315
            US 9,149,052
            US 8,545,920

My client would be happy to speak with you regarding its technology and a potential business
relationship moving forward, if appropriate.

Sincerely,

Cooley LLP

Michelle S. Rhyu

Michelle S. Rhyu

Exhibit A
Page 4

From: william pfost <bill@ni-q.com>
Date: Tuesday, March 21, 2017 at 8:56 PM
To: Scott Elster <selster@prolacta.com>
Cc: Vanessa Sterrett <VSterrett@prolacta.com>
Subject: Follow Up

  Scott:
>
> Your assistant, Ms. Sterrett, has been very persistent in attempting to set up
> a discussion "as soon as possible" between our respective IP counsel.   As a
> result of our call, however, I was not aware of  any great urgency regarding
> the timing of such a discussion.  I remain extremely confident that we are not
> infringing any of Prolacta's patents.
>
>
> At this point, I do not feel comfortable sharing our opinions and waiving our
> attorney client privilege.
>
> If you would be so kind as to allow me a few more weeks to consider your
> proposed potential business or co-marketing arrangement, I would then be in a
> much better position to respond.
>
>
> Thanks
>
>
> Bill
>
>
Bill Pfost
CEO, NI-Q

1

Exhibit B
Page 5

Sent from my iPhone 6

Begin forwarded message:

> From: "Scott Elster SElster@prolacta.com" <SElster@prolacta.com>
> Date: March 22, 2017 at 2:26:51 PM EDT
> To: Bill Pfost <Bill@ni-q.com>
> Cc: "Fuller, Alyson <afuller@cooley.com> (afuller@cooley.com)"
> <afuller@cooley.com>, Vanessa Sterrett <VSterrett@prolacta.com>
> Subject: RE: Follow Up
>
> Hi Bill:
>
> I am disappointed that there will not be a call between our attorneys.  I
> thought that would have been a positive step forward.  However, I can
> understand your  logic. The fact remains that based on your brochure, we are
> concerned that you are infringing our patent.  As you know, our IP is critical
> to the business and it must be protected.
>
> I am hopeful that we can work this out quickly since there is a sensible
> business solution.  Vanessa will set up a call the first week in April to
> discuss the  situation.
>
> Best,
>
> Scott
>
>
>
> Scott Elster
> President & Chief Executive Officer
> Prolacta Bioscience®
> Advancing the Science of Human Milk®
> 757 Baldwin Park Blvd.
> City of Industry, CA. 91746
>
> Phone | 626-626-9520

Exhibit C
Page 6

> Email | selster@prolacta.com <mailto:selster@prolacta.com>
> Website| www.prolacta.com <http://www.prolacta.com/>
>
> Connect With Us
>  <http://www.facebook.com/prolacta>  <http://twitter.com/prolacta>
> <http://www.linkedin.com/company/prolacta-bioscience>
> <http://youtube.com/user/prolactabioscience/>
>
> Prolacta develops clinically proven, high-value products derived from human
> milk that are designed to meet the needs of extremely  premature infants in
> the Neonatal Intensive Care Unit.
>
>
> From: Bill Pfost [mailto:Bill@ni-q.com]
> Sent: Tuesday, March 21, 2017 8:56 PM
> To: Scott Elster SElster@prolacta.com
> Cc: Vanessa Sterrett
> Subject: Follow Up
>
>
>
>   Scott:
>>
>> Your assistant, Ms. Sterrett, has been very persistent in attempting to set
>> up a discussion "as soon as possible" between our respective IP counsel.   As
>> a result of our call, however, I was not aware of any great  urgency
>> regarding the timing of such a discussion.  I remain extremely confident that
>> we are not infringing any of Prolacta's patents.
>>
>> At this point, I do not feel comfortable sharing our opinions and waiving our
>> attorney client privilege.
>>
>> If you would be so kind as to allow me a few more weeks to consider your
>> proposed potential business or co-marketing arrangement, I would then be in a
>> much better position to respond.
>>
>> Thanks
>>
>> Bill
>>
>>
>
> Bill Pfost
>
> CEO, NI-Q
>
>

Exhibit C
Page 7

From: william pfost <bill@ni-q.com>
Date: Monday, April 3, 2017 at 10:08 AM
To: Scott Elster <selster@prolacta.com>
Cc: Vanessa Sterrett <VSterrett@prolacta.com>
Subject: Re: Follow Up

Scott:

While I appreciate your offer to conduct testing on the behalf of Ni-Q, I do
not think it is at all necessary, or beneficial for either company at this
time. I do understand your desire to aggressively protect your patents,  and
we at Ni-Q respect the intellectual property of others.  However, I do not
understand the basis of your concern about Ni-Q infringing Prolacta[1]s
patents.  We are unaware of any legitimate basis for such a concern, and
nothing in Ni-Q[1]s Brochure should  have raised such a concern.  Certainly,
the claims of Prolacta[1]s patents require more than just [3]matching donor
genetic identity marker profiles with donated milk samples[2], the only
concept specifically identified in your attorney[1]s letter. Your attorneys
even say that they [3]have very limited visibility into the products and
processes being developed by Ni-Q.[2]  This raises the question of whether
you have any basis at all to be concerned about infringement.  Unless you
can provide a detailed explanation of  why you think we infringe, I consider
this matter closed.

Thanks

Bill

Bill Pfost
CEO, NI-Q

From: william pfost <bill@ni-q.com>
Date: Tuesday, March 21, 2017 at 8:56 PM
To: Scott Elster <selster@prolacta.com>
Cc: Vanessa Sterrett <VSterrett@prolacta.com>
Subject: Follow Up

    Scott:
>
> Your assistant, Ms. Sterrett, has been very persistent in attempting to set up

> a discussion "as soon as possible" between our respective IP counsel.   As a
> result of our call, however, I was not aware of  any great urgency regarding
> the timing of such a discussion.  I remain extremely confident that we are not
> infringing any of Prolacta's patents.
>
>
> At this point, I do not feel comfortable sharing our opinions and waiving our
> attorney client privilege.
>
> If you would be so kind as to allow me a few more weeks to consider your
> proposed potential business or co-marketing arrangement, I would then be in a
> much better position to respond.
>
>
> Thanks
>
>
> Bill
>
>
Bill Pfost
CEO, NI-Q



# KOPPEL | IP

## INTELLECTUAL PROPERTY ATTORNEYS

**JAYE G. HEYBL** | 805.373.0060 | jheybl@koppelip.com

T: 805.373.0060
F: 805.373.0051

WESTLAKE VILLAGE
2815 TOWNSGATE ROAD
SUITE 215
WESTLAKE VILLAGE, CA
91361

LOS ANGELES
12777 W. JEFFERSON BLVD.
BUILDING D, SUITE 300
PLAYA VISTA, CA
90066

May 11, 2017

Via Email and US Mail
**Ni-Q, LLC**
28050 SW Boberg Road
Wilsonville, Oregon 97070

Attn.: Mr. Bill Pfost, CEO

Re:     Intellectual Property Owned by Prolacta Bioscience

Dear Mr. Pfost:

We represent Prolacta Bioscience Inc. ("Prolacta") regarding its intellectual property matters and understand that you have been in contact with Prolacta regarding its following U.S. Patents:

US 7,943,315
US 8,278,046
US 8,545,920
US 8,628,921
US 9,149,052

In your most recent communication to Prolacta dated April 3, 2017, you indicated that unless Prolacta provides a detailed explanation of how Ni-Q infringes these patents you "consider this matter closed." I trust you understand that Prolacta cannot consider this matter closed until it receives additional information regarding Ni-Q's products. As a patent owner, Prolacta has the duty to police its patent rights and part of that duty involves fully investigating when it believes that others may be infringing those rights.

Prolacta has been conducting its own investigation, but has been unable to uncover details regarding Ni-Q's products sufficient to show whether or not Ni-Q's products are infringing Prolacta's patents. Ni-Q has provided no information in its communications with Prolacta, Ni-Q's products are not readily available, and there is little publicly available documentation on Ni-Q's products and methods.  As such, Prolacta now has no choice but to seek that information from Ni-Q. To bring this matter to a conclusion, Prolacta respectfully requests your prompt cooperation.

Exhibit E
Page 10

Ni-Q
May 11, 2017
Page 2

Please provide us with a sample of each of Ni-Q's human donated milk products, including but not limited to Ni-Q's HDM Plus™ products. Please send the samples to our office at the Westlake Village address above along with invoices for the products. We will immediately remit payment for the samples. Please also let us know if you would prefer to receive payment ahead of sending the samples and we will forward full payment.

Please also provide us with the following information regarding Ni-Q's human donated milk products, including but not limited to the Ni-Q HDM Plus™ products:

1. What is the mg/ml human protein constituent for your human donated milk products?
2. What is the mg/ml human fat constituent for your human donated milk products?
3. What is the mg/ml human carbohydrate constituent for your human donated milk products?

Please also provide the following information regarding Ni-Q's processing of its human donated milk products, including but not limited to the Ni-Q HDM Plus™ products:

4. Does Ni-Q conduct filtering of its human donated milk products?  If so, please let us know the size of the filter in microns.
5. Does Ni-Q heat treat its human donated milk products?  If so, please let us know the heat treatment temperature and heat time.
6. Does Ni-Q add a fat portion to the skim portion to adjust the fat in the skim in its human donated milk products?
7. Does Ni-Q pasteurize its human donated milk products to produce a processed human breast milk composition?

Your candid responses to the questions above and your cooperation in providing Ni-Q's products are critical to bringing this matter to a conclusion. Please let us know by May 22, 2017, whether Ni-Q will cooperate with these requests and when we can expect to receive the products and full responses. If we do not hear from you by that date, we must assume that Ni-Q will not be cooperating and that the responses to the above questions would not be favorable to Ni-Q's non-infringement position.

Best regards,
KOPPEL, PATRICK, HEYBL & PHILPOTT

Jaye G. Heybl

Cc: Prolacta Bioscience Inc.

# FARBER LLC

4 Corporate Drive • Suite 287 • Shelton • CT • 06484 • (203) 258-1305 • markfarber@farberllc.com

**VIA EMAIL and FEDERAL EXPRESS**

Mr. Jaye G. Heybl
Koppel, Patrick, Heybl & Philpott, P.C.
2815 Townsgate Road
Suite 215
Westlake Village, CA 91361

**Re: May 11, 2017 Letter to Ni-Q, LLC**

Dear Mr. Heybl:

As counsel for Ni-Q, LLC ("Ni-Q"), your letter dated May 11, 2017 has been forwarded to me for review and reply. As you are now aware that Ni-Q is represented by counsel, any future correspondence regarding this matter and Prolacta Bioscience Inc. ("Prolacta") should be directed to my attention, and no further letters should be sent directly to Mr. Bill Pfost or any other individual at Ni-Q.

Prolacta's attorneys at Cooley LLP reached out to Ni-Q back in November 2016 regarding the patents referenced in your correspondence. In addition, Scott Elster, Prolacta's President and CEO, had e-mail exchanges with Ni-Q earlier this year during which Mr. Pfost expressed that Ni-Q is "extremely confident that we are not infringing any of Prolacta's patents." Your persistence in this matter, especially in view of your admission that you have absolutely no basis for alleging infringement (as shown by the statement in your letter that you are "unable to uncover details regarding Ni-Q's products"), amounts to harassment and must cease.

Your assumption, based on Ni-Q's not providing the requested information in response to what amounts to a Prolacta fishing expedition, "that the responses to the above questions would not be favorable to Ni-Q's non-infringement position", is unfounded. Ni-Q simply does not provide the type of information you seek in your letter to those outside the company, particularly its competitors.

Ni-Q respects the intellectual property rights of others. Allegations of infringement are taken quite seriously, prudently investigated, and promptly and responsibly addressed. A thorough investigation will be conducted into any legitimate, fact-based concern your client may raise. To that end, it might be helpful to understand your perspective on this issue if you were to

provide a claim chart, indicating how Ni-Q's product includes each and every element of the claim language of the patents identified in your letter.

Unless you can provide a detailed, fact-based explanation of the basis for your concern, I reiterate Mr. Pfost's sentiment that Ni-Q considers this matter closed.

Very truly yours,

Mark Farber

cc:   Mr. Bill Pfost, CEO Ni-Q, LLC
      Mr. Brent Houston, General Counsel Ni-Q, LLC

2



INTELLECTUAL PROPERTY ATTORNEYS

**JAYE G. HEYBL** | 805.373.0060 | jheybl@koppelip.com

T: 805.373.0060
F: 805.373.0051

<span style="text-transform:uppercase">Westlake Village</span>
2815 TOWNSGATE ROAD
SUITE 215
WESTLAKE VILLAGE, CA
91361

LOS ANGELES
12777 W. JEFFERSON BLVD.
BUILDING D, SUITE 300
PLAYA VISTA, CA
90066

May 19, 2017

*Via Email at* markfarber@farberllc.com *and US mail*

Mark Farber
FARBER LLC
4 Corporate Drive, Suite 287
Shelton, CT 06484

   Re: Intellectual Property Owned by Prolacta Bioscience

Dear Mr. Farber:

  We received your undated letter that purports to be in response to our letter dated May 11, 2017. Prolacta remains frustrated by Ni-Q's refusal to cooperate in response to Prolacta's reasonable efforts to resolve this matter. Ni-Q could help bring this matter to a quick conclusion if it would give short and candid responses to the simple questions posed by Prolacta. Ni-Q's continued silence on these matters only heightens Prolacta's concerns that Ni-Q is violating Prolacta's patents.

  In your letter you assert that Prolacta has "absolutely no basis for alleging infringement. This is simply not true. Prolacta is an expert regarding this class of products, and pioneered the industry that your client is now trying to enter. Based on its expertise in this industry and based on the limited publicly available documentation regarding Ni-Q's products, Prolacta has a strong belief that Ni-Q is infringing its patents. Very few questions remain following Prolacta's investigation, and our previous letter was intended to answer those questions.

  Your letter does raise concerns. Although you quote statements made in previous communications between Ni-Q and Prolacta, your letter does not specifically refute Prolacta's infringement claims. Furthermore, you indicate that an "investigation will be conducted" if Prolacta can provide a sufficient fact based concern. This confirms that Ni-Q has not conducted an investigation into Prolacta's allegations, and instead is relying on a strategy of withholding information from Prolacta.

Ni-Q
May 19, 2017
Page 2

Your letter mentions a concern about providing the requested information to a competitor. Our request for a sample of Ni-Q's products should not be a concern since these products are presumably being offered to those in the health care industry. Products being offered to the public cannot be considered Ni-Q's confidential information. We again ask that Ni-Q provide samples of its products.

If there truly is a concern that answering our questions will reveal Ni-Q's confidential information, we can address this concern by treating this information as "Confidential – Attorney Eyes Only." The information will only be viewed by Prolacta's outside attorneys, and will not be communicated to Prolacta, its officers, board or employees.

Prolacta remains interested in resolving this matter, but to do so it must have Ni-Q's cooperation. Please let us know by May 26, 2017, if Ni-Q will be providing the requested samples and if Ni-Q is agreeable to answering our questions with the above confidentiality requirement.

Best regards,
KOPPEL, PATRICK, HEYBL & PHILPOTT

Jaye G. Heybl

| From: | Mark Farber |
| --- | --- |
| To: | JHeybl@koppelip.com |
| Cc: | Bill Pfost; brent@ni-q.com |
| Subject: | Prolacta v Ni-Q |
| Date: | Thursday, June 01, 2017 6:34:12 PM |

### Via Email

Dear Mr. Heybl:

My client, Ni-Q, LLC, is at a loss to understand why Prolacta has filed a complaint against it for alleged patent infringement (the "Complaint"), particularly in light of Ni-Q's timely and pointed responses to Prolacta's recent communications in this regard. Let this email be the fourth time that Ni-Q expresses to Prolacta that Ni-Q has every confidence and belief that its product does not infringe Prolacta's Œ921 patent.

The Complaint contains inaccuracies, most specifically with regard to the allegations set forth in Sections 16, 17 and 22 of the Complaint.  Ni-Q does not engage in "testing mammary fluid (including milk) to establish or confirm the identity of the donor of the mammary fluid."  Further, Ni-Q does not engage in "testing human milk-based products utilizing the same methods as those in the Œ921 Patent."  Additionally, it appears that there is no evidentiary basis, no Rule 11 support, for the allegations in the Complaint that "the donated mammary fluid for the Ni-Q products in question are then processed so that the donated mammary fluid comprises the protein, fat and carbohydrate constituents in the ranges as provided in claim", at least because Ni-Q does not practice this process.

Ni-Q respectfully requests that Prolacta cease harassing Ni-Q and immediately withdraw the Prolacta Complaint against it, as such a filing is harmful to Ni-Q's business and reputation.

Best regards,

Mark Farber


Mark Farber, Esq.
Farber LLC
4 Corporate Drive, Suite 287
Shelton, CT 06484
203-258-1305
markfarber@farberllc.com
http://www.farberllc.com

This message is confidential and may contain information which is privileged or attorney work product. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.  Distribution of the message is prohibited.



**KOPPEL | IP**

INTELLECTUAL PROPERTY ATTORNEYS

T: 805.373.0060
F: 805.373.0051

WESTLAKE VILLAGE
2815 TOWNSGATE ROAD
SUITE 215
WESTLAKE VILLAGE, CA
91361

JAYE G. HEYBL | 805.373.0060 | jheybl@koppelip.com

LOS ANGELES
12777 W. JEFFERSON BLVD.
BUILDING D, SUITE 300
PLAYA VISTA, CA
90066

June 2, 2017

*Via Email at* markfarber@farberllc.com *and US mail*

Mark Farber
FARBER LLC
4 Corporate Drive, Suite 287
Shelton, CT 06484

Re:     *Prolacta Bioscience, Inc. v. Ni-Q, LLC*
        U.S. District Court, Central District of California
        Case 2:17-cv-04071
        Docket No. 1109-77-002

Dear Mr. Farber:

        We did not receive a response from you to our letter of May 19, 2017. We had hoped that Ni-Q would be more cooperative such that this matter might be amicably resolved. Ni-Q instead chose to stonewall by refusing to provide samples of its products and by refusing to provide even the most basic information. Facts discovered through investigations support Prolacta's belief that Ni-Q is infringing at least one of Prolacta's patents, and Ni-Q's stonewalling left Prolacta with no choice but to file the attached complaint.

        Please advise as to whether you are authorized to accept service of the attached complaint on behalf of Ni-Q. If we do not hear from you by June 9, 2017, we will assume that you cannot accept service and we will seek service by other means.

Exhibit I
Page 17

Ni-Q
June 2, 2017
Page 2

     Please also advise as to whether Ni-Q might reconsider its unwillingness to cooperate. I am available to discuss this matter with you. Please let us know by June 9, 2017, Ni-Q's position on cooperating and if you are interested in holding a phone conference.

               Best regards,
               KOPPEL, PATRICK, HEYBL & PHILPOTT

               Jaye G. Heybl

JGH:cm
Enclosure

Exhibit I
Page 18

**From:** "Jaye G. Heybl" <JHeybl@koppelip.com>
**Date:** Friday, June 16, 2017 at 1:17 PM
**To:** Author Author <markfarber@farberllc.com>
**Subject:** RE: Re: Prolacta v Ni-Q

Mr. Farber,

I received your email below. Again, you provide absolutely no details regarding Ni-Q's methods and products. We have asked for this information several times now in an effort to resolve this dispute, and I have invited you to talk on the phone so that we might discuss this matter. Instead of accepting my invitation, you have engaged in an email campaign with baseless attacks on me and my firm. We have conducted our investigation and have compelling reasons to believe that Ni-Q is infringing Prolacta's patent. We have asked for additional information from Ni-Q so that we could either confirm our evidence or give Ni-Q the opportunity to provide evidence to refute our beliefs. Instead of providing the requested information you continue with your blanket denials.

Here is just a sample of the quotes from Ni-Q documents that support our infringement allegations:

"Finally, genetic analysis is used to match each donor with her milk" (Ni-Q Information Brochure)

"Ni-Q is sending out an updated consent form that includes DNA matching. This matching system ensures that Ni-Q is indeed receiving your breastmilk and your breastmilk solely by confirming the DNA present in your breastmilk is that same as the DNA received in the buccal swab." (Ni-Q

Instructions to donors)

"I _____(Your Name), voluntarily request that Genetics Associates Incorporated conduct DNA-based testing on cheek swab samples and human breast milk I provide to Ni-Q solely to confirm the origin of the milk I donate to Ni-Q and ensure the absence of  bovine product in such milk." (Ni-Q Informed Consent for DNA Testing)

Prolacta remains interested in resolving this dispute, and I remain available to discuss this matter at your convenience.

Jaye Heybl

---

**From:** Mark Farber [mailto:markfarber@farberllc.com]
**Sent:** Wednesday, June 07, 2017 3:53 PM
**To:** Jaye G. Heybl <JHeybl@koppelip.com>
**Cc:** Bill Pfost <Bill@ni-q.com>; brent@ni-q.com
**Subject:** Re: Re: Prolacta v Ni-Q

**<u>Via Email</u>**                                                          June 7, 2017

Dear Mr. Heybl:

As you are aware, Ni-Q, LLC ("Ni-Q") substantively responded to your original demand letter on behalf of Prolacta Bioscience, Inc. ("Prolacta") dated May 11, 2017 on May 17th.   You ignored the May 25th email (in response to your May 19th letter) that I sent on Ni-Q's behalf. It is unfortunate and disturbing that you would take the disingenuous position that you did not receive the emails and then claim that "Ni-Q's stonewalling left Prolacta with no choice but to file the attached complaint."  I followed up with a June 1, 2017 email (in response to your filed complaint), as well as, a June 2, 2017 email. Oddly, I note that you only just (on June 5th) responded to my June 1st email.

Ni-Q is now reaching out yet again (i.e., making this the fifth time) to express to Prolacta that Ni-Q has total confidence in its belief that its product does not infringe Prolacta's '921 patent, at least for the following reasons:

> 1. Contrary to Section 16 of the complaint, Ni-Q does not engage in "testing mammary fluid (including milk) to establish or confirm the identity of the donor of the mammary fluid," at least because Ni-Q does not compare "the identity marker profiles, wherein a match between the identity marker profiles indicates that the mammary fluid was obtained from the specific subject" or "process the donated mammary fluid whose identity marker profile has been matched with a reference identity marker profile," both as stated in claim 1;

> 2. Contrary to Section 17 of the complaint, Ni-Q does not engage in "testing human

milk-based products utilizing the same methods as those in the '921 patent;" and

    3.  Contrary to Section 22 of the complaint, Ni-Q products do not have the protein, fat and carbohydrate constituents in the ranges as provided in claim 1.

In addition, Ni-Q has no regular place of business in California and indeed has not made a single product sale in California, making venue in the Central District of California improper.

Your fictitious accusation that Ni-Q's alleged "stonewalling" is "leading to an escalation of this dispute" (from your June 5th email) is not well-received.  Ni-Q, quite reasonably and properly, attempted to address Prolacta's concerns by requesting a claim chart detailing how Ni-Q's product purportedly includes each element of the claim language of the '921 patent to better understand Prolacta's perspective.  Prolacta did not respond to this request, but rather filed the lawsuit, despite the fact that Prolacta has no evidentiary support (confirmed by your May 11th statement that you were "unable to uncover details regarding Ni-Q's products").  Therefore, Ni-Q can only conclude that you signed this complaint in violation of Rule 11, subjecting yourself and your client to the risk of sanctions, and also engaging in misuse of patents, harassment, and frivolous and vexatious litigation, each of which is harmful to Ni-Q's business and reputation.

Ni-Q requests that Prolacta dismiss its complaint immediately.  If it does so, Ni-Q will consider not seeking redress for the damages it has incurred through this process.

Lastly, I do not have authority to accept service on behalf of Ni-Q.

Best regards,


Mark Farber

Mark Farber, Esq.
Farber LLC
4 Corporate Drive, Suite 287
Shelton, CT 06484
203-258-1305
markfarber@farberllc.com
http://www.farberllc.com

This message is confidential and may contain information which is privileged or attorney work product. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.  Distribution of the message is prohibited.

**Attorney Docket No.     PROL-005/04US (308366-2080)**                 **PATENT**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In Re Application of: | MEDO, Elena, et al. | Confirmation No.: | 4096 |
| Serial No.: | 13/592,678 | Group Art Unit: | 1632 |
| Filed: | August 23, 2012 | Examiner: | Not yet assigned |
| FOR: | METHODS FOR TESTING MILK | | |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## PRELIMINARY AMENDMENT

Prior to examination of the above-identified application, please amend the above-captioned application as follows:

**Amendments to the Specifications** begin on page 2 of this paper.

**Amendments to the Claims** begin on page 3 of this paper.

**Remarks** begin on page 8 of this paper.

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

**IN THE SPECIFICATION:**

Please amend the paragraph beginning at page 1, line 5 under the heading CROSS REFERENCE TO RELATED APPLICATIONS, as follows:

This application is a <u>continuation of U.S. Appl. No. 13/079,932, filed April 5, 2011, now U.S. Pat. No. 8,278,046, which is a continuation of U.S. Appl. No. 12/052,253, filed March 20, 2008, now U.S. Pat. No. 7,943,315, which is a</u> continuation-in-part and claims priority to the international application PCT/US2006/036827 with an international filing date of September 20, 2006, which, in turn, claims priority under 35 U. S. C. §119 from Provisional Application Serial Nos. 60/719,317, filed September 20, 2005, and 60/731,428, filed October 28, 2005.  The disclosures of ~~applications PCT/US2006/036827, U.S.S.N. 60/719,317, and U.S.S.N. 60/731,428~~ <u>all of each of which</u> are incorporated herein by reference in their entireties.

2.

175272 v1/DC

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

**IN THE CLAIMS:**

1. (Currently Amended)  A method for determining whether a donated mammary fluid was obtained from a specific subject, the method comprising:

(a)   testing a donated biological sample from the specific subject to obtain at least one reference identity marker profile for at least one marker;

(b)  testing a sample of the donated mammary fluid to obtain at least one identity marker profile for the at least one marker in step (a); ~~and~~

(c)  comparing the identity marker profiles,

wherein a match between the identity marker profiles indicates that the mammary fluid was obtained from the specific subject; and

(d)   processing the donated mammary fluid whose identity marker profile has been matched with a reference identity marker profile, wherein the processed donated mammary fluid comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55 mg/mL; and a human carbohydrate constituent of 70-120 mg/mL.


2. (Cancelled)


3.   (Currently Amended) The method of claim [[2]] 1, wherein the mammary fluid is human breast milk.


4. (Cancelled)


5. (Currently Amended)  The method of claim [[4]], wherein the processing comprises

(a)  filtering the milk;

(b)  heat-treating the milk;

(c)  separating the milk into cream and skim;

(d)  adding a portion of the cream to the skim; and

(e)  pasteurizing.


3.

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

6. (Cancelled)

7. (Currently Amended)  The method of claim [[6]] 1, wherein the composition further comprises one or more constituents selected from the group consisting of: calcium, chloride, copper, iron, magnesium, manganese, phosphorus, potassium, sodium, and zinc.

8. (Cancelled)

9. (Cancelled)

10. (Currently amended)  The method of claim [[4]] 1, wherein processing comprises separating the milk into a cream portion and a skim portion, processing the cream portion, and pasteurizing the cream portion.

11. (Cancelled).

12. (Currently Amended)  The method of claim [[11]] 1, further comprising nucleic acid typing, wherein the nucleic acid typing comprises a method selected from the group consisting of: STR analysis, HLA analysis, multiple gene analysis, and a combination thereof.

13-15. (Cancelled)

16. (Original) The method of claim 1, wherein the donated mammary fluid is frozen.

17. (Cancelled)

19. (Cancelled)

20. (Original) The method of claim 1, wherein the mammary fluid sample comprises a mixture of one or more mammary fluid samples.

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

21. (Cancelled)

22. (Cancelled)

23. (Cancelled)

24. (Original) The method of claim 1, wherein the donated biological sample is selected from a group consisting of: milk, saliva, buccal cell, hair root, and blood.

25-27. (Cancelled)

28. (Original) The method of claim 1, wherein steps (a) through (c) are carried out at a human breast milk donation center or at a milk processing facility.

29. (New) The method of claim 1, wherein steps (a) and (b) are carried out at different facilities.

30. (New)  The method of claim 29, wherein step (a) is carried out at a human breast milk donation facility and step (b) is carried out at a milk processing facility.

31. (New)   A method for processing a donated human breast milk obtained from a specific subject comprising:

(a) testing a donated biological sample from the specific subject to obtain at least one reference identity marker profile for at least one marker;

(b) testing a sample of the donated human breast milk to obtain at least one identity marker profile for the at least one marker in step (a);

(c) comparing the identity marker profiles of steps (a) and (b), wherein a match between the identity marker profiles indicates that the donated human breast milk was obtained from the specific subject;

5.

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

(d) processing the donated human breast milk whose identity marker profile has been matched with a reference identity marker profile, wherein the processing comprises:

(i) filtering the donated human breast milk; (ii) heat treating the donated human breast milk;

(iii) separating the donated human breast milk into cream and skim; (iv) adding a portion of the cream to the skim to form a human milk composition; and (v) pasteurizing the human milk composition to produce a processed human breast milk composition.

and wherein the processed donated human breast milk comprises a human protein constituent of 11-20 mg/mL; a human fat constituent of 35-55  mg/mL; and a human carbohydrate constituent of 70-120 mg/mL.

32.  (New)  A processed human milk composition suitable for administration to an infant made by the process of claim 31.

33.  (New)  The method of claim 31, wherein the method further comprises adding to the processed human breast milk one or more constituents selected from the group consisting of: calcium, chloride, copper, iron, magnesium, manganese, phosphorus, potassium, sodium, and zinc.

34.  (New)  The method of claim 31, wherein the testing of the donated human breast milk of step (b) and the testing of the donated biological sample of step (a) comprises nucleic acid typing selected from the group consisting of: STR analysis, HLA analysis, multiple gene analysis, and a combination thereof.

35.  (New) The method of claim 31, wherein the donated biological sample is selected from a group consisting of: milk, saliva, buccal cell, hair root, and blood.

36.  (New)  The method of claim 31, wherein steps (a) through (c) are carried out at a human breast milk donation center or at a milk processing facility.

175272 v1/DC

Appl. No.: 13/592,678
Attny Docket No.: PROL-005/04US

37. (New) The method of claim 31, wherein steps (a) and (b) are carried out at different facilities.

38. (New)  The method of claim 37, wherein step (a) is carried out at a human breast milk donation facility and step (b) is carried out at a milk processing facility.

7.